**RGJ ASSOCIATES, INC. d/b/a Williamsville Products, Plaintiff,**

**v.**

**STAINSAFE, INC., Defendant.**

**No. CIV.A. 01–10936–MBB.**

United States District Court, D. Massachusetts.

Sept. 30, 2004.

John Mark Dickison, Lawson & Weitzen, LLP, Boston, MA, Valerie L. Pawson, Lawson & Weitzen, LLP, Boston, MA, David A. Rich, Lawson & Weitzen, LLP, Boston, MA, Michael Williams, Lawson & Weitzen, LLP, Boston, MA, for Plaintiff.

Henry C. Dinger, Goodwin, Procter LLP, Boston, MA, Steven Ellison, Broad and Cassel, West Palm, FL, Jacob A. Labovitz, Palmer & Dodge, LLP, Boston, MA, Michael J. Lacek, New England Financial, Boston, MA, Michael J. Mott, Rose & Associates, Boston, MA, William C. Nystrom, Nystrom Beckman & Paris LLP, Boston, MA, Dana A. Zakarian, Goodwin, Procter LLP, Boston, MA, for Defendant.

### MEMORANDUM AND ORDER RE: PLAINTIFF'S CHAPTER 93A CLAIM

BOWLER, United States Magistrate Judge.

On April 9, 2004, after a 17 day trial, the jury rendered a verdict in favor of plaintiff RGJ Associates, Inc. ("RGJ") d/b/a Williamsville Products ("Williamsville") on the breach of contract, breach of the implied duty of good faith, breach of goods sold and delivered and the promissory estoppel claims.[1] The jury awarded RGJ $33,632 on the breach of contract and breach of the implied duty of good faith claims, $72,000 on the breach of goods sold and delivered claim and $755,867 on the promissory estoppel claim. In answering a special verdict question with respect to the intentional misrepresentation claim, however, the jury determined that Williamsville failed to establish all of the necessary elements of the claim.

In accordance with a pretrial ruling, the factually similar portion of the chapter 93A claim was tried to this court simultaneously with the above jury claims. The parties submitted proposed findings on the chapter 93A claim shortly after the trial's conclusion. Accordingly, with the exception of any remaining, dissimilar facet of the chapter 93A claim not received during the jury trial, the chapter 93A claim is ripe for review.[2]

---

1. The jury also found that defendant Stainsafe, Inc. ("Stainsafe") failed to establish its breach of contract affirmative defense to the breach of goods sold and delivered claim.

2. With respect to the law of this case, these findings and conclusions apply only to the chapter 93A facet of this action. In addition, neither party argues that this court *must* reach a certain conclusion under chapter 93A claim on Seventh Amendment grounds with respect to the construction of the contract and the damages suffered. *See Perdoni Brothers, Inc. v. Concrete Systems, Inc.,* 35 F.3d 1, 5 (1st Cir.1994) (further noting that judge and jury may reach conflicting conclusions in the chapter 93A context).

## FACTUAL BACKGROUND [3]

Williamsville, a producer of quality furniture care products for the retail furniture industry, started doing business in the 1950s. Robert "Kip" Johnson ("Johnson"), President of RGJ, purchased the company in the early 1980s. At that time, Williamsville produced Williamsville wax, which retail purchasers used to preserve wood and leather furniture. Johnson proceeded to operate the business and acquired various clients including Scandinavian Design.

In the fall of 1985, Johnson attended a furniture market in High Point, North Carolina and met two officials of Troy Furniture Products ("Troy"), a company that sold fabric protection products. Johnson and the two officials informally agreed to form a partnership.

After two further meetings in November 1985 and January 1986, Troy and Williamsville cemented an arrangement whereby Troy would purchase all of the furniture care products it needed for the retail furniture care market in the United States exclusively from Williamsville. Troy also agreed to annually increase sales of the Williamsville product line which, at the time, included wood, leather and lacquer furniture care products. Williamsville, in turn, agreed to supply Troy with all of its needs for such products and not to compete with Troy in the retail residential furniture care market. Although the agreement did not contain a specified duration, Williamsville was given the option of terminating the agreement with 90 days written notice if the annual volume became flat or if Troy failed to pay for products within 90 days. The parties did not memorialize their agreement with a written contract.

In the summer of 1989, Troy and Williamsville began developing a furniture wood care kit for ArtVan Furniture ("ArtVan"), a residential furniture care dealer in the United States based in Michigan. ArtVan eventually became one of the premiere residential furniture care dealers in the United States and one of Stainsafe's largest purchasers of wood care kits. In June 1990, Johnson turned down an opportunity for Williamsville to sell furniture care products directly to ArtVan because of the agreement with Troy.

In early 1990, Stainsafe became interested in acquiring Troy. Marc Abrams ("Abrams"), who in 1990 was Stainsafe's President as well as a director and shareholder, together with Robert Sayre ("Sayre"), then Vice President,[4] and two other partners formed Stainsafe in 1984 or 1985. Abrams and Sayre each acquired a 25% interest in the company.[5] The company began as a Teflon distributor for fabric protection products sold to retail furniture stores. Before 1990, warranty protection plans were Stainsafe's most important product with other products constituting a minor part of the business vis-à-vis the warranty programs.

After Stainsafe approached Troy about acquiring the company, Larry Moses, Troy's President, agreed to the acquisition.[6] In June 1990, Moses told Johnson

---

3. Citations to the record are provided primarily only for direct quotes.

4. Sayre is presently Stainsafe's President, a position he has held for the past five years.

5. The Krasney family owns a 25% share. Irving and Steven Friedman each own 12½% of the remaining shares. Abrams is no longer President. He was asked to be bought out and eventually fired.

6. For a period of time after the acquisition, Stainsafe did business under the Troy name and Moses remained with the company. For clarity, this court refers to Stainsafe doing business as Troy as simply Stainsafe.

about the acquisition and that Stainsafe wanted a written agreement of the parties' exclusive arrangement. Accordingly, in June 1990 Johnson spoke with both Sayre and Abrams who uniformly expressed their excitement about "partnering" with Williamsville.

Sayre drafted a written agreement that led to the June 27, 1990 letter agreement and sent the draft to Johnson in Massachusetts prior to a June 22 RGJ board meeting. RGJ, doing business as Williamsville, was at all relevant times based in Massachusetts, the locus of all of the company's manufacturing.

The RGJ board meeting took place at Johnson's house in Sudbury, Massachusetts. Johnson, his brother and then wife took part in the meeting. During the meeting, Johnson explained that Stainsafe wanted a written agreement under which Williamsville would exclusively sell certain products to Stainsafe. The board thereafter approved entering into the exclusive distribution contract with Stainsafe. Additional conversations took place resulting in the letter agreement dated June 27, 1990 ("the 1990 letter agreement" or "exclusive dealing contract").

Under the unsigned 1990 letter agreement,[7] Stainsafe agreed to sell all of the products Williamsville supplied and to make a "conscious sales effort" to annually increase its sales of "the Williamsville product line." (Ex. 504). Under the par-

ties' arrangement, Stainsafe agreed to buy exclusively from Williamsville all of the products it needed that were encompassed within "the Williamsville product line." Williamsville, in turn, agreed not to compete with Stainsafe in the residential furniture care market with the exception of a number of accounts. In essence, Stainsafe agreed to assume the duties performed by Troy under the prior agreement.

The 1990 letter agreement constitutes the parties' final, albeit not exclusive, expression of their agreement.[8] See Mass. Gen. L. ch. 106, § 2–202. At the time the parties entered into the contract, Williamsville did not have a fabric furniture care protection product. It was only in the mid 1990s that Williamsville developed fabric protection products for Stainsafe. In 1990, therefore, the "Williamsville product line" consisted of wood, leather and lacquer care furniture care products.

After the acquisition, Williamsville tested various products such as wood and leather cleaners and produced wood and leather care kits for Stainsafe. Williamsville typically purchased wood care products in bulk, bottled and labeled them at its leased, Framingham, Massachusetts plant and sold them to Stainsafe. In the fall of 1990, Williamsville gave Stainsafe permission to use the Williamsville name. Sayre subsequently authorized Johnson to communicate directly with Stainsafe's clients.

---

7. The absence of the parties' signatures on the letter agreement does not preclude the existence of a contract. *See Polaroid Corporation v. Rollins Environmental Services*, 416 Mass. 684, 624 N.E.2d 959, 963–964 (1993); *DB Riley, Inc. v. AB Engineering Corporation*, 977 F.Supp. 84, 89 (D.Mass.1997); *Restatement (Second) of Contracts* § 30(2) & cmt. b (1979).

8. The summary judgment opinion details the structure and language of the letter agreement (Docket Entry # 83, p. 13, l. 8—p. 17, l. 8), explains the UCC's parol evidence rule and

discusses why the letter agreement is a final, albeit not exclusive, expression of the parties' agreement (Docket Entry # 83, pp. 25–31). The 1990 letter agreement is part of the trial record. The reasoning of the summary judgment opinion relative to the foregoing is incorporated herein. For ease of reference, the incorporated excerpts of the opinion are reproduced in addendum A with exhibit numbers corresponding to exhibits admitted at trial.

In the summer of 1991, Stainsafe broached Williamsville in regard to performing its own bottling and labeling. Williamsville rebuffed the suggestion and accurately warned Stainsafe that if it began purchasing from Williamsville in bulk then we would "have to reconsider our current contract." (Ex. 507). Accordingly, relatively early in the parties' relationship, Stainsafe learned that Williamsville would object if Stainsafe reconfigured the parties' contract and performed its own bottling and labeling of products encompassed within the Williamsville product line. Consequently, it covertly developed the capacity, purchased product from other vendors and performed such compounding years later.

In the fall of 1991, Sayre visited Johnson in Massachusetts and toured the Framingham facility. In March 1992, Sayre made another trip to Massachusetts and, together with Johnson, visited Abbott Box in Randolph, Massachusetts, Williamsville's box supplier, and Andler Bottle Company in Everett, Massachusetts, Williamsville's bottle supplier. After visiting a local grocery store and seeing a Quaker Oats cereal box, Sayre and Johnson decided on a green and beige color scheme for Stainsafe's furniture care kits.

Initially, the business between Williamsville and Stainsafe grew at a relatively modest pace. Williamsville's total sales to Stainsafe in the 1990 calendar year amounted to $43,282 or 35% of Williamsville's entire sales. By 1992, however, Stainsafe's purchases increased to $261,541, a figure representing 70.2% of Williamsville's total sales. That figure increased to $487,183 or 78.5% and $582,526 or 85.6% in 1993 and 1994, respectively. Thereafter, Williamsville's reliance upon Stainsafe steadily swelled such that by 1998 sales to the company comprised almost 95% of Williamsville's business.

During these years, Williamsville produced the majority of Stainsafe's products.

Williamsville's corresponding need for a larger facility and more equipment also grew. In 1992 and 1993, Johnson had various discussions with Sayre about leasing additional space. In January 1994, after Sayre advised Johnson that he was authorized to procure additional space, Johnson leased another 900 square feet in the Framingham facility. In the spring of 1994, Johnson spoke with Sayre a number of times about needing even more space as well as additional equipment. Sayre instructed Johnson to obtain as much space as Johnson thought viable for the business. Consequently, Johnson negotiated a lease and moved to a larger space in Framingham.

In 1994, Williamsville began developing silicone based polishes called "Poly–Clean" and "Poly–Clear" for ArtVan on behalf of Stainsafe. Williamsville developed the lacquer care products for use on polyester, marble, glass, tile and laminate furniture. By 1994, Williamsville also began producing a viable, water based fabric protection product which it later sold to Stainsafe.

With Stainsafe's permission, Williamsville marketed the products to ArtVan on stationery depicting "Williamsville Products" under the heading "Stainsafe Companies." (Ex. 17). In the summer of 1994 and again with Stainsafe's permission, Williamsville marketed products to another Stainsafe client on Stainsafe stationery.

The parties' close business relationship proceeded smoothly and continued without incident in 1995. Sales to Stainsafe grew from $498,586 in 1994 to $643,078 in 1995. In 1995, Johnson began exploring the possibility of selling a furniture polish to Wal–Mart. Sayre, however, discouraged the relationship and in late 1995 informed Johnson that Stainsafe might consider changing the parties' contract. As a re-

sult, Johnson decided not to pursue a business relationship with Wal–Mart.

In 1996, Johnson had further conversations with Sayre about the growth of the business and Williamsville's continued need for more space. Williamsville's business with Stainsafe in 1996 increased to a level of $713,121 in sales or 88.7% of Williamsville's total sales. Williamsville also needed space to house inventory of unassembled component goods that Williamsville kept on hand for Stainsafe prior to receiving an order.[9]

In April 1997 and unbeknownst to Williamsville, Irving and Steven Friedman together with Sayre and Samuel J. Krasney formed a real estate limited partnership. Steven Friedman testified that Stainsafe acquired the land for its current facilities in 1997. The partnership purchased adjoining land in late 1998 for Stainsafe's new in-house compounding facilities. Stainsafe constructed two buildings on the property located on Hiatt Drive in Palm Beach Gardens, Florida. The new facility eventually allowed Stainsafe to compound, bottle and label its own furniture care products. Stainsafe completed the move into the new bottling and packaging building in August 2000.

Meanwhile, Johnson continued to search for larger facilities and in the summer of 1997 located a property in Ashland, Massachusetts suitable for Stainsafe's longterm growth needs. The property included four buildings and could accommodate an 800% increase in business. Issues with the property, including the discovery of hazardous waste contamination, however, delayed Johnson's decision to purchase the property. Johnson kept Stainsafe fully apprised of his efforts.

During a January 1998 visit to Stainsafe before signing the lease, Johnson saw a rendering of the two Hiatt Drive buildings in Sayre's office. Sayre inaccurately informed Johnson that one of the buildings was just a real estate investment that Stainsafe would lease to a third party when, in fact, Stainsafe anticipated that the building would house its planned compounding facility.[10] Indeed, on January 28, 1998, Stainsafe obtained a building permit for the buildings at the Hiatt Drive location. Shortly after receiving assurances from Sayre and other Stainsafe officials, Johnson, together with several other individuals, purchased the Ashland property and signed a 15 year lease with a concomitant increase in rent in early 1998. Before Johnson entered into the transaction, Sayre opined to Johnson that a 15 year lease would not pose a problem and was, in fact, a good idea.[11]

The move to the Ashland facility in April 1998 cost Williamsville $5,400. Williamsville also invested an estimated $76,000 in leasehold improvements.

In May 1998, while the exclusive dealing contract was still in effect and unbeknownst to Williamsville, Stainsafe began negotiating with Uniters, SPA ("Uniters")

---

9. Before compounding, Williamsville stored Stainsafe's inventory, including such items as bottles, cartons, tubes and caps, at no charge.

10. Sayre's statement about the reason for the new building was dishonest. By January 1998, circumstantial evidence reveals that Stainsafe had begun planning to distribute, bottle and package its own products in house in that future building.

11. Stainsafe's vague comments and knowledge of Johnson's activities regarding Williamsville's move to the new property do not contravene chapter 93A. Johnson made an independent business judgment that Williamsville should purchase the property. He also became a part owner and, as such, received a direct benefit from the rent paid by Williamsville under the 15 year lease which provided an incentive for his actions.

to acquire the U.S. distribution rights to the company's Leather Master line of products. The acquisition involved Stainsafe's purchase of the Corium Corporation ("Corium"). Corium operated a plant in Greensboro, North Carolina where it obtained products from Uniters in Italy and distributed them in the United States. The Leather Master product line consisted of an estimated 350 touch up, repair, cleaning and/or protection products for leather furniture. A number of the products directly competed with leather care products in the Williamsville product line encompassed within the exclusive dealing contract.

In July 1998, Stainsafe moved its corporate offices from Riviera Beach to the Hiatt Drive facility. In addition to the building housing the corporate offices, there was a building that Stainsafe initially used for warehousing. The building later housed Stainsafe's filling, packaging, compounding and distribution center.

Meanwhile, Stainsafe's secret negotiations with Uniters continued over the summer of 1998. In order to gauge the effectiveness of switching from Williamsville to Uniters,[12] Stainsafe needed information from Johnson. It did not, however, wish to disrupt the parties' business relationship and the flow of Williamsville products to Stainsafe. Accordingly, on the pretext that his computer system could not print out all of the data, Sayre asked Johnson in July 1998 for a break down of all leather care kits purchased and shipped to Stainsafe or to Stainsafe's customers during the past year broken down by customer and

product. Unwittingly assisting Stainsafe in its assessment to purchase the distribution rights of a competitor, Johnson complied with the request.

Stainsafe was also concerned that if it switched from leather products in the Williamsville product line to leather products in the Leather Master product line, that Williamsville would become a direct and effective competitor. In order to minimize or eliminate this prospect, Sayre attempted to have Williamsville sign a broad non-compete agreement that went significantly farther than the parties' exclusive dealing contract. The proposed non-compete agreement would prevent Williamsville from selling any product in the retail furniture trade as long as Stainsafe purchased any product from Williamsville. When Johnson received the proposed agreement, he immediately telephoned Sayre and asked him why he wanted the agreement. Sayre dishonestly replied that he just wanted to upgrade his records.

In lieu of signing the agreement, Johnson told Sayre he would look for the original agreement on his computer. Accordingly, in August 1998 Johnson sent Sayre the original 1990 letter agreement. With modifications to reflect retained accounts and the change of name from Troy to Stainsafe, Sayre and Johnson signed the agreement in late August 1998.[13]

By August 1998, Williamsville was producing and supplying Stainsafe with fabric furniture care products in addition to the wood, leather and lacquer products it produced prior to August 1990 when the parties entered into the original exclusive

---

12. Of course, given the absence of a termination and durational provision in the parties' exclusive dealing contract, there is nothing untoward of switching distributers provided Stainsafe gave Williamsville reasonable notice. Nor did Stainsafe have a duty to disclose the negotiations to Williamsville. Fur-

thermore, Williamsville had yet to suffer any loss of money or property within the meaning of section 11.

13. This court will continue to refer to the agreement as the 1990 letter agreement or the exclusive dealing contract.

dealing contract. Although the document does not define the components of the "Williamsville product line," the parties' course of dealing evidences that the term included Williamsville's fabric furniture care products produced for Stainsafe at the time. Furthermore, Sayre testified that from 1990 to 1998, Stainsafe was getting the majority of its fabric, wood, leather and lacquer care products from Williamsville. Course of performance for more than a year following the signing of the August 1998 exclusive dealing contract confirms that the parties intended to include fabric in the Williamsville product line. Finally, the agreement's language supports this implication. *See Gestetner Corporation v. Case Equipment Co.,* 815 F.2d 806, 811 (1st Cir.1987); *Pepsi–Cola Co. v. Steak 'N Shake, Inc.,* 981 F.Supp. 1149, 1158 (S.D.Ind.1997); (Docket Entry # 215, fn. 24). In August 1998 and thereafter, the parties' exclusive dealing contract therefore obligated Stainsafe to purchase all of its requirements for wood, leather, fabric and lacquer care products encompassed in the "Williamsville product line" from Williamsville.

In connection with negotiating and acquiring the distribution rights to Leather Master, Stainsafe also wanted to review sales training manuals and literature for leather care products.[14] In August 1998, Sayre therefore asked Johnson for Williamsville's sales literature on the pretext that Stainsafe needed the material for its sales force. Johnson complied by sending Sayre copies of copyrighted material on leather care sales training created by Williamsville. During this time period, Sayre also asked Johnson to research Leather Master on the Internet without disclosing that Stainsafe was negotiating to purchase the distribution rights, perma-

nently discontinue its leather care purchases with Williamsville and take over the business of a Williamsville competitor. Johnson again complied with the request.

In early September 1998, Sayre asked Johnson to compile sales figures for leather care kits purchased and shipped to Stainsafe or to Stainsafe's customers during the past year with the unit costs. Sayre did not explain why Stainsafe needed the material. Johnson sent Sayre the information.

On October 8, 1998, Johnson learned of the Leather Master negotiations when Steven Friedman informed him by telephone that Stainsafe was seriously considering purchasing the U.S. distribution rights to Leather Master. In an effort to appease Johnson and obtain his expertise in the transaction, Steven Friedman told him that he, speaking to Johnson in his capacity as Williamsville's President, would have an equity interest in the transaction. Steven Friedman urged Johnson to travel to Florida to assist with the negotiations and to meet with Uniters.

Accordingly, Johnson acted on the promise by purchasing plane tickets while in Massachusetts and then traveling to Florida to assist in the transaction.[15] On October 13, 1998, Johnson met with Sayre and Steven Friedman in Florida before meeting and negotiating with Uniters officials on Stainsafe's behalf. During Johnson's private meeting with Steven Friedman and in an effort to secure Johnson's assistance with the negotiations, Steven Friedman quantified the equity interest as a 25% interest in the stock of the new organization if the deal was consummated. Steven Friedman, however, had no intention of giving Williamsville an equity inter-

---

**14.** Circumstantial as opposed to direct evidence supports this finding.

**15.** There is insufficient evidence of the amount Johnson paid for the airfare.

est in the deal.[16] In fact, Stainsafe needed the 25% share for another individual. Stainsafe also told Johnson that Williamsville would be involved in the filling and packaging of the Leather Master products which would be moving to Massachusetts.

After the conversation with Steven Friedman, Johnson proceeded to negotiate privately with Uniters officials on Stainsafe's behalf. Johnson's efforts proved successful and the negotiations concluded at the end of the day with Stainsafe, Williamsville and Uniters officials shaking hands and reaching an agreement in principle. A lavish, celebratory dinner followed the successful negotiations.

Johnson returned to Massachusetts the following day. On October 18 or 19, 1998, Steven Friedman telephoned Johnson, who was in Massachusetts, and told him that he would not be receiving the 25% equity interest. Instead, Steven Friedman told Johnson to be patient and that Stainsafe would "make sure you are not financially affected by this move"[17] and that Williamsville would be doing all the filling and packaging for the Leather Master products. Johnson acquiesced or agreed to the substitution of this new promise in lieu of the promise of a 25% equity interest. Like the promise of a 25% equity interest, however, this second promise by Steven Friedman proved untrue. The promise nevertheless served Stainsafe's need not to have Johnson cancel or disrupt shipments of leather products until it completed the transition to the Leather Master product line.[18] Stainsafe also wanted to appease Johnson so that the parties' relationship with respect to the wood, lac-

quer and fabric products would remain unchanged.

Not hearing anything from Stainsafe for the next two weeks, Johnson, located in Massachusetts, sent Steven Friedman an electronic message on November 4, 1998. The message detailed the issues that needed addressing during the phase out period. Steven Friedman replied by repeating that Williamsville would not be financially affected by the transactions and again asked for Johnson's patience. In the fall of 1998 at Stainsafe's request, Williamsville sent Stainsafe a number of cases of "brights," which are unlabeled bottles filled with specific furniture care products.

In or around January 19 or 20, 1999, Steven Friedman telephoned Johnson and advised him there were "major problems" at the Greensboro facility and asked Johnson to travel there as soon as possible. Again at his own expense, Johnson traveled to North Carolina in late January 1999 and spent two days at the Greensboro facility with Anthony Milano ("Milano"), Vice President of Operations at Stainsafe, and a number of other individuals.

In light of the supposed plan to transfer the Leather Master production to Massachusetts, Johnson began reworking the Ashland facility to accommodate the packaging of Leather Master products. He also assisted Stainsafe in the phase out of obsolete inventory.

On March 15, 1999, Johnson received news that his brother was diagnosed with cancer and had only six months to live. Johnson's brother died 16 days later.

16. Circumstantial as opposed to direct evidence supports this finding.

17. Steven Friedman repeated this statement in a November 4, 1998 electronic message transmitted to Johnson in Massachusetts.

18. A November 1998 electronic message from Steven Friedman urges Johnson not to "cancel any [leather] orders until you have received confirmation from us to do so." (Ex. 519).

Johnson did not return to work until the middle of April.

On April 14, 1999, Milano, who was in Florida, telephoned Johnson, who was in Massachusetts.[19] Milano advised Johnson that Leather Master had told Stainsafe to pull Williamsville out of the deal. Johnson thereby learned that Williamsville would not be performing the packaging or filling of the Leather Master products.

A May 7, 1999 letter addressed but not sent to Johnson that Milano authored notes that, with the exception of the leather care business, Stainsafe had every intention of continuing its business relationship with Williamsville "as it has existed in the past."[20] The letter evidences that Stainsafe was aware of its contractual obligation and promises to Williamsville and was seeking to quantify Williamsville's losses as a result of the Leather Master acquisition.[21] (Ex. 58).

On the other hand, this court finds that Johnson agreed to Stainsafe changing the promise from a 25% equity interest to a move of certain Leather Master operations to Massachusetts and, finally, changing the latter to a promise to make Williamsville whole. The parties were experienced businessmen and, contrary to plaintiff's posi-

tion, Johnson was not at a significant disadvantage in comparison to Stainsafe. Johnson was also fully aware that the transition to Leather Master was in a state of flux. Indeed, at times the transition regressed as opposed to progressed.[22]

During the winter and spring of 1999, Johnson continued performing the prior agreement by providing Stainsafe with wood, fabric and lacquer care products. Williamsville also began getting ready to transfer the leather care business. Aside from the loss of the leather care business, it was business as usual between the parties. Stainsafe's wood care purchases remained consistent during this time period. Stainsafe purchased the majority of its fabric, lacquer and wood care products from Williamsville and such products were encompassed in the Williamsville product line.

The parties' conduct during this time period and their course of performance in the spring and summer of 1999 clearly evidence an agreement to have the exclusive dealing contract, minus the leather component, remain intact.[23] Faced with a material breach, Johnson had the choice of either continuing the contract or suing for the breach.[24] He chose to continue with the contract, minus the leather com-

---

**19.** Milano returned the telephone call initially made to him by Johnson.

**20.** This court does not consider the letter as objective evidence of an agreement entered into in early 1999 to continue the parties' relationship as it previously existed minus the leather care products.

**21.** The letter estimates Williamsville's annual loss of leather care purchases resulting from Stainsafe's purchase of the distribution rights of Leather Master, "your competitor," as $522,181.68. (Ex. 58).

**22.** Under the circumstances, this court finds that the conduct with respect to the Leather Master transaction did not amount to unfair or deceptive act or practice in violation of

section 11. Alternatively, Stainsafe met its burden, albeit barely, of showing that the conduct with respect to these promises did not occur primarily and substantially in Massachusetts within the meaning of chapter 93A. This court expresses no opinion at this time whether the conduct provides a foundation for the jury's promissory estoppel award.

**23.** Johnson made the decision to continue the prior exclusive dealing contract in Massachusetts.

**24.** In the face of a material breach, an injured party such as Williamsville may "elect to keep the contract alive." *Lander v. Samuel Heller Leather Co.,* 314 Mass. 592, 50 N.E.2d 962, 965 (1943) ("injured party may refuse to con-

ponent, and Stainsafe agreed. Williamsville's and Stainsafe's conduct shows that it was business as usual with respect to the non-leather components of the exclusive dealing contract.[25]

■ Put another way or in the alternative, the parties agreed to modify the 1990 letter agreement to exclude leather. Thus, after Stainsafe's material breach of the letter agreement, the parties impliedly agreed that Stainsafe and Williamsville would continue their prior exclusive dealing contract as to wood, fabric and lacquer care products.[26]

■ In April 1999, Johnson made a decision in Massachusetts to raise prices 10% for ArtVan products and 13% for a number of other products encompassed in the Williamsville product line. Johnson sent Stainsafe a letter with the price increases explaining that his business was to be cut by 40%, in other words, that he was facing financial difficulties. The price increases were reasonable in light of the increased costs absorbed by Williamsville in prior years and permissible under the parties' exclusive dealing contract.[27]

Upon receiving the letter, Steven Fried-

sider a breach as a material one and elect to keep the contract alive"). "The contract then continues for the benefit of both parties." *Lander v. Samuel Heller Leather Co.,* 50 N.E.2d at 965. A well known treatise elaborates the distinction between electing to continue with the contract, i.e., foregoing the immediate right to rescind the contract, and waiver of the right to sue for damages caused by the breach. *See* Joseph M. Perillo *Calamari and Perillo on Contracts* § 11.33 & n. 3 (2003) ("[i]n the case of a material breach, the aggrieved party may elect to continue the contract and sue for a partial breach"); *see also Chilton Insurance Co. v. Pate & Pate Enterprises, Inc.,* 930 S.W.2d 877, 887–888 (Tex.Ct.App.1996) (non-breaching party waived its excuse for its non-performance "by treating the contract as continuing despite Chilton's alleged material breach and supposed misrepresentation"); *Bergstrom Air Force Base Federal Credit Union v. Mellon Mortgage, Inc. East,* 674 S.W.2d 845 (Tex.Ct. App.1984); *Mandril v. Kasishke,* 620 S.W.2d 238, 245 (Tex.Civ.App.1981) ("where there has been a material breach which does not indicate an intention to repudiate the remainder of the contract, the injured party has a genuine election either of continuing performance or of ceasing performance"); *Rubber Trading Co. v. Manhattan Rubber Manufacturing Co.,* 221 N.Y. 120, 116 N.E. 789, 790 (1917) (cited by the court in *Lander*); Mass. Gen. L. ch. 106, § 1–103.

Given the facts found by this court, the present circumstances do not involve an anticipatory repudiation on the part of Stainsafe with Williamsville unjustifiably insisting upon performance of the leather component of the

agreement. *See* Joseph M. Perillo *Calamari and Perillo on Contracts* § 12.8 at p. 504 (2003) (modern view, adopted by UCC, is that non-repudiating party may not elect to keep contract in force in the face of a repudiation). Stainsafe did not intend to repudiate the remainder of the contract. *Cf. Mandril v. Kasishke,* 620 S.W.2d at 245. In any event, Stainsafe, the supposed repudiator, agreed to Williamsville's continued performance of the contract minus the leather component. *See* Joseph M. Perillo *Calamari and Perillo on Contracts* § 12.8 n. 16 at p. 505 (2003).

**25.** Whether Johnson also renounced or waived his right to sue for damages for the material breach that resulted from the Leather Master transaction by not notifying Stainsafe of the breach until the April 26, 2001 letter from Williamsville's counsel need not be addressed at this time. *See generally Bergstrom Air Force Base Federal Credit Union v. Mellon Mortgage, Inc. East,* 674 S.W.2d at 849 ("right to refuse to perform further or to accept further performance and to maintain immediately an action for damages because of a material or total breach may be waived, and the injured party may accept or insist on performance after such breach of contract").

**26.** A modification of the parties' existing contract requires no consideration. Mass. Gen. L. ch. 106, § 2–209(1).

**27.** Where, as here, the exclusive dealing contract did not contain an express provision as to price, the parties impliedly agreed to a reasonable price. *See* Mass. Gen. L. ch. 106, § 2–305.

man telephoned Johnson.[28] Steven Friedman asked Johnson to rescind the price increases and the two agreed to a meeting in June to discuss the issue. Given the impetus of the price increases and in an effort to have Johnson rescind the price increases, Steven Friedman promised Johnson that Stainsafe would guaranty Williamsville's profits and favorably described Stainsafe's new comprehensive program. Stainsafe internally quantified leather sales to Williamsville as $522,181.68 in 1998.

On June 10, 1999, Johnson met with Steven Friedman at Stainsafe's offices in Florida. Expressing shock about the price increases, Steven Friedman again asked Johnson to roll back the increases and reminded Johnson of their "partnership." By this time, Stainsafe comprised an estimated 95% of Williamsville's business. On the other hand, Stainsafe was also at a disadvantage because it lacked the capacity to immediately switch wood suppliers and did not wish to jeopardize the sizable ArtVan account.[29]

At the June meeting, Steven Friedman confirmed that Stainsafe would continue to purchase from Williamsville all of the wood, fabric and lacquer care products. He further explained how Stainsafe was going to give Williamsville a whole new program which he described as the comprehensive program. Steven Friedman assured Johnson that Williamsville would receive a great deal of business with the introduction of the comprehensive plan. He also repeated the earlier promise to Johnson that Williamsville would not have any financial loss because of the Leather Master deal and that Stainsafe would continue to make Williamsville whole.[30]

During the June 1999 meeting, Steven Friedman also accurately informed Johnson that Stainsafe was having cash flow problems. The problems stemmed partly from Stainsafe's decision to construct new facilities which it sought to conceal from Williamsville.[31] The company had $400,000 remaining on a line of credit by the end of the year.

Also during the meeting in Florida, Johnson agreed to roll back the prices. In making this decision in Florida to roll back the price increases, Johnson relied on Steven Friedman's promise to make Williamsville whole and that Stainsafe would make sure that Williamsville would not have any financial loss because of the Leather Master transaction.[32]

---

28. Milano also spoke with Johnson by telephone about the price increases during this time period.

29. Hence, Johnson's bargaining power was not as weak as surmised by RGJ.

30. This court finds that Stainsafe made this promise to Williamsville as opposed to Johnson acting in his personal capacity. Stainsafe's contract was with Williamsville, not with Johnson personally, and Stainsafe purchased Williamsville products and conducted business with Williamsville, not with Johnson acting in his personal capacity. Having considered these and other factors, this court concludes that Steven Friedman made the promise to Williamsville.

31. When Richard Donahue, then a Williamsville consultant, visited Stainsafe in September 2000, he attempted to walk near the new distribution, bottling and packaging building and was promptly advised to leave.

32. In contrast to the creation and the performance of the modified contract as well as Johnson's April 2001 discovery of the Stainsafe wood care kits at Jordan's Furniture in Natick, Massachusetts, which occurred primarily and substantially in Massachusetts, Johnson's reliance and decision to roll back the price increases took place in Florida. Stainsafe met its burden, albeit barely, of showing that this misconduct did not occur primarily and substantially in Massachusetts.

Stainsafe also made an offer to purchase the net assets of Williamsville during the meeting. When Johnson returned to Massachusetts and spoke with his accountant, he decided not to pursue the matter inasmuch as the offer did not adequately account for the value of the company's good will.

For approximately the last six months of 1999, Stainsafe fell behind in its payments to Williamsville. A number of invoices remained outstanding for a time period in excess of 90 days and Williamsville's accounts receivable balance rose to as high as $400,000. Stainsafe did not seek extensions for overdue payments from all of its suppliers. As a result of Stainsafe's decision not to pay Williamsville on a timely basis, Johnson experienced difficulties paying his own invoices. Moreover, Stainsafe knew that its failure to pay Williamsville in a timely manner placed "financial pressure" (Ex. 564) on the company but nonetheless chose not to access Stainsafe's remaining $400,000 line of credit. Instead, Stainsafe used funds, in part, to pay costs associated with the Leather Master transaction and the transition to an in house distribution, bottling and packaging facility.

During this time period, Johnson was well aware that Stainsafe had not provided Williamsville with a long term commitment. (Ex. 564). Rather, like the 1990 letter agreement, the duration of the agreement without the leather component was open ended.

In November 1999, the parties' relationship took a brief turn for the better. In early November, Johnson, Richard Donahue ("Donahue"), a consultant for Williamsville who became the company's general manager in January 2000, Steven Friedman, Sayre and Milano had a positive meeting in Florida. They discussed inventory related issues, the brights program and that Williamsville would receive all of Stainsafe's business from Levitz and from a new "Home Life" program with Sears. The promised significant increase in business from the Levitz and Sears programs, however, never materialized primarily because Stainsafe performed the work in house. The Home Life program involved fabric and wood care products. The Levitz program included wood, lacquer and fabric care products.

Also in November 1999 and unbeknownst to Williamsville at the time, Stainsafe began purchasing fabric care products encompassed in the Williamsville product line that were manufactured by Innovative Chemical Technologies, Inc. ("ICT"), a Williamsville competitor located in Georgia.[33] The impact of this bad faith conduct was experienced by Williamsville in Massachusetts through a decrease in production orders.

In early 2000, Milano attempted to procure the ArtVan business for Stainsafe. By letter dated January 25, 2000, Milano wrote to John McInnis at ArtVan and urged him to switch to a Stainsafe wood care product. Milano touted the improved quality of the product "made possible through an improved state of the art compounding facility and specialized filling machines." [34] (Ex. 65).

In 2000, Stainsafe sent Williamsville a number of inaccurate forecasts. The pro-

---

**33.** Williamsville produced and manufactured a similar product.

**34.** Williamsville did not suffer a loss of money or property as a result of Milano's attempt to procure the ArtVan business. Milano, Stainsafe's most credible witness, also testified that he had no knowledge of the Williamsville/Stainsafe agreement which was in effect at the time with respect to such wood care products.

jected Sears and Levitz orders did not transpire and Williamsville's actual volume from Stainsafe was approximately $500,000 less than an April 2000 forecast. The primary reason for the decrease or reduction in orders was Stainsafe's performance of the work in house.

In the summer of 2000, Stainsafe also began purchasing lacquer care products encompassed in the Williamsville product line from one or more other vendors. (Ex. 134). In late 2000, Stainsafe began purchasing wood care products from one or more other vendors. (Ex. 134). The parties' exclusive dealing contract obligated Stainsafe to purchase these lacquer and wood care products, as well as the fabric care products, encompassed in the Williamsville product line from Williamsville. Unbeknownst to Williamsville at the time, Stainsafe purchased fabric care products manufactured by ICT, a Williamsville competitor, and then bottled the product in house.[35]

In August 2000, Stainsafe moved into the distribution, bottling and packaging building at the Hiatt Drive facility.[36] In a major departure from the parties' usual course of performance, Stainsafe instructed Williamsville not to assemble kits or brights until receiving a work assembly order from Stainsafe. The only exception was for ArtVan orders. Rather than disclose Stainsafe's active plans to transition to its own compounding facility, Stainsafe misled Johnson by explaining the change as tying "up cash flow and space." (Ex. 532).

Although Williamsville profited from its association with Stainsafe in 2000, orders fluctuated and did not meet sales forecasts. Stainsafe did not, however, simply terminate the contract and provide Williamsville with reasonable notice or otherwise inform Williamsville that it was compounding products encompassed within the Williamsville product line in house at a time when the revised contract remained in place. Instead, Stainsafe dishonestly and inaccurately misled Williamsville, located in Massachusetts, by explaining the disparity as due to a lack of orders from retail customers or to the use of a more sophisticated inventory tracking system.

In November 2000, Stainsafe sent an order to Williamsville in Massachusetts for more than 1,500 brights. When Johnson asked Milano if Stainsafe would need product to fill the bottles, Milano informed Johnson that Stainsafe was trying to put together a retail program for potential customers and that Williamsville would be involved if anyone purchased the program. Johnson never discovered what happened to the empty bottles.

In late 2000 and early 2001, Stainsafe's inventory at the Ashland plant was low. Stainsafe nevertheless requested an increase in the amount of insurance coverage for the inventory. Unbeknownst to Williamsville, Stainsafe was concerned about the possibility of Williamsville withholding the inventory if it discovered Stainsafe's misconduct.

In January 2001, Stainsafe asked Donahue, located in Massachusetts, for the size of the bottles and caps used for the ArtVan wood kits. In early April 2001 and also at Stainsafe's request, Williamsville shipped Stainsafe a single case of ArtVan kits directly from Massachusetts to Stainsafe as opposed to Williamsville's custom-

---

**35.** It was not until May 2001 that Williamsville learned that Stainsafe had been ordering products from ICT.

**36.** Although Williamsville was aware of the existence of the building as a warehouse by August 2000, it remained unaware of Stainsafe's use of the building for bottling and packaging.

ary practice of shipping the product from Massachusetts directly to ArtVan.

In late January 2001, Stainsafe ordered a number of brights and wood care kits from Williamsville for Harlem Furniture, a Stainsafe client. During this time period and because of the low volume of Stainsafe orders, Williamsville had to borrow money to meet its overhead costs. After an inquiry from Johnson in Massachusetts, Milano assured him not to be concerned and that business would increase the following month.

In early March 2001, Stainsafe placed another unusual order with Williamsville in Massachusetts for more than 1,500 sets of two ounce brights. Inasmuch as Williamsville customarily prepared the labels for such bottles, Johnson asked Robin Catlin of Stainsafe why Williamsville was not building the kits in Massachusetts. In reply, she misleadingly explained to Johnson, then located in Massachusetts,[37] that Stainsafe was using the brights in retail sales and selling them one at a time in packs to various retail customers.

In the middle of April 2001 and at a time when the 1990 letter agreement was in effect and obligated Stainsafe to purchase wood care kits exclusively from Williamsville, Williamsville fortuitously discovered that Stainsafe was selling wood care kits at Jordan's Furniture ("Jordan's") in Natick, Massachusetts that were not supplied by Williamsville. The caps differed from those supplied by Williamsville. The Stainsafe labels on the product contained language used by Williamsville, including language that the product does not contain silicone. Although silicone gives wood furniture a luster and shine, it also damages the finish. Williamsville prides itself on the absence of silicone in its products. When Johnson opened the bottle, it appeared to contain silicone and water. Chemical testing confirmed Johnson's assumption.

In or around April 17, 2001, Johnson retained the firm of Lawson & Weitzen, LLP ("L & W"). By letter dated April 26, 2001, L & W notified Stainsafe that it was in material breach of the parties' contract.

Thereafter, Stainsafe advised Jordan's by letter dated May 2, 2001, about the labeling error. Stainsafe's letter described the error as "typographical" and the letter did not mention silicone as the source of the error. In May 2001, Johnson discovered that Stainsafe had been selling similarly mislabeled wood care products to Harlem Furniture and Levitz. Stainsafe stipulated that these products contained silicone.[38]

After receiving the aforementioned letter from L & W, Stainsafe withheld payment on goods that Williamsville had sold and delivered to Stainsafe.[39] Unaware of

---

37. Circumstantial evidence, including the fact that Johnson resided in Massachusetts and Williamsville's location was in Massachusetts, supports this finding.

38. Williamsville did not suffer a loss of money or property with regard to this mislabeling. With respect to the first phase of the trial proceedings, there is no chapter 93A liability for the mislabeling conduct for a number of reasons, one of which being the absence of a causal connection. *See RSA Media, Inc. v. AK Media Group, Inc.*, 260 F.3d 10, 16 (1st Cir. 2001).

39. Stainsafe's argument that it had no notice of this aspect of the chapter 93A claim is without a basis in law or in fact. The *Halper* case, cited by Stainsafe, involved a chapter 93A count which expressly described the claim as " 'conduct in filing meritless Default Notices and a Notice of Termination ... subsequent to and in direct retaliation for [the plaintiff's] commencement of this lawsuit ....' " *Halper v. Demeter*, 34 Mass.App.Ct. 299, 610 N.E.2d 332, 333–334 (1993). The plaintiff in *Halper* unsuccessfully and belatedly attempted to broaden the claim during closing argument. The court rejected the attempt even though the amended complaint

Stainsafe's decision, Williamsville continued to ship a number of Stainsafe orders in May 2001.

After learning about Stainsafe's decision not to pay for goods sold and delivered in May 2001, Williamsville withheld shipment of a $29,196 ArtVan order. By the spring of 2001, the parties had abandoned their agreement. Stainsafe responded by filing suit against Williamsville complaining about the withheld shipment in state court in Florida.[40] Invoices for goods sold and delivered prior to May 10, 2001, totaled more than $100,000 and therefore gave Williamsville more than reasonable grounds for insecurity and the concomitant right to demand and receive adequate as-

surances. *See* Mass. Gen. L. ch. 106, § 2–609(1)–(2) & UCC cmt. 3.

Stainsafe also complained about the approximately $200,000 of Stainsafe inventory held by Williamsville. In June 2001, Williamsville made the inventory available for pick up. Stainsafe, however, initially refused to reimburse or pay Williamsville for shipping the inventory to Florida. After additional entreaties from L & W, in late September 2001 Stainsafe wired funds to pay the necessary freight charges for the return of its inventory. Shortly thereafter, Williamsville returned the inventory.

In August 2001, when Johnson began contacting residential furniture stores in an effort to obtain business, the stores were cordial but declined to do business

---

incorporated by reference the background paragraphs in the amended complaint. The court further determined that pretrial discovery "was unlikely to alert a reasonable defendant to the presence of a broader c. 93A attack than that specified in the complaint." *Halper v. Demeter*, 610 N.E.2d at 335.

In sharp contrast to the circumstances in *Halper*, the chapter 93A count in the amended complaint contains no limiting language confining the claim to anything more than the broad, boiler plate language that Stainsafe committed unfair and deceptive acts or practices. The chapter 93A count incorporates paragraphs one through 45. Paragraph 27 alleges that Stainsafe withheld payment of the $142,054.08 indebtedness for goods sold and delivered "as a means of exerting economic pressure upon RGJ." (Docket Entry # 2, ¶ 27). Johnson's June 8, 2001 affidavit filed in support of the motion for an equitable attachment of the funds repeats the claim that Stainsafe's withholding payment of this money owed to Williamsville was "a means of exerting economic pressure upon RGJ." (Docket Entry # 5, ¶ 25). Retaining funds as a means of economic extortion or ordering products without an intent to pay for them is a well established means of violating section 11. *See Levings v. Forbes & Wallace, Inc.*, 8 Mass.App.Ct. 498, 396 N.E.2d 149, 153–154 (1979); *Pepsi–Cola Metro. Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 17–18 (1st Cir. 1985) (discussing commercial extortion as means of violating chapter 93A); *Arthur D.*

*Little International, Inc. v. Dooyang Corporation*, 979 F.Supp. 919, 925 (D.Mass.1997). Represented by counsel, there simply is no basis in fact that Stainsafe lacked notice of this portion of the chapter 93A claim.

That said and although this court rejects Stainsafe's argument, this court does not find a chapter 93A violation for the conduct. Early on in this dispute, Stainsafe agreed to place the funds in escrow and the court ordered the parties to enter into an escrow agreement as opposed to directing Stainsafe to immediately pay Williamsville the moneys owed. In accordance with the court's September 2001 ruling on the motion for an equitable attachment (Docket Entry # 4), the parties placed the funds in escrow, presumably in an interest bearing bank account.

**40.** The Florida suit sought, *inter alia,* injunctive relief and highlighted the failure of Williamsville to provide Stainsafe with 90 days written notice of cancellation.

This court does not consider the filing of the Florida complaint as a basis for chapter 93A liability. Moreover, contrary to Williamsville's request (Docket Entry # 247, ¶ 124) and as requested by Stainsafe (Docket Entry # 254, ¶ B(44)), even if this court considered the Florida complaint, Stainsafe's filing of the complaint does not contravene chapter 93A.

with Williamsville. It became very difficult for Williamsville to turn its business around particularly in light of the business climate after September 11, 2001. The number of employees declined from an estimated 20 to 25 in early 1999 to four by the end of 2001. In 2001, the business lost a total of $515,000 and from January to May 2002, it lost approximately $200,000.

## DISCUSSION

### A. *Chapter 93A Liability*

RGJ seeks to impose liability against Stainsafe under section 11 of chapter 93A. The commercial nature of the parties' transactions as well as the fact that both are engaged in trade or commerce dictate the application of section 11 as opposed to section nine. *See generally Linkage Corporation v. Trustees of Boston University,* 425 Mass. 1, 679 N.E.2d 191, 206–207 (1997).

Stainsafe seeks to avoid section 11 liability on the basis that the misconduct, if any, did not occur primarily and substantially in the Commonwealth. Section 11 includes an affirmative defense which requires the defendant to prove that the actions and transactions constituting the unfair or deceptive act or practice "did not occur primarily and substantially within the commonwealth." Mass. Gen. L. ch. 93A, § 11; *see Amcel Corporation v. International Executive Sales, Inc.,* 170 F.3d 32, 34–35 (1st Cir.1999) (characterizing "the 'primarily and substantially' condition" as an affirmative defense that the defendants did not include in their answer which ordinarily forfeits the defense).[41]

The Massachusetts Supreme Judicial Court ("the SJC") recently clarified that the appropriate analysis of the defense is not based upon a test identified by a particular factor or group of factors. *Kuwaiti Danish Computer Co. v. Digital Equipment Corporation,* 438 Mass. 459, 781 N.E.2d 787, 799 (2003). Accordingly, First Circuit law prior to *Kuwaiti,* which unwaveringly relied on three factors and oftentimes applied "special significance" to the second factor, i.e., "the location of the person to whom the deceptive statements are made," *Play Time v. LDDS Metromedia Communications, Inc.,* 123 F.3d 23, 33 (1st Cir.1997), "may no longer be good law." *Workgroup Technology Corporation v. MGM Grand Hotel, LLC,* 246 F.Supp.2d 102, 117 (D.Mass.2003). Indeed, the First Circuit in *Kenda Corporation, Inc. v. Pot O'Gold Money Leagues, Inc.,* 329 F.3d 216 (1st Cir.2003), recognizes that the SJC in *Kuwaiti,* "[i]nstead" of using the First Circuit's three factor test, employed "a fact-intensive approach" to answer the question of whether the misconduct occurred primarily and substantially in Massachusetts. *Id.,* 329 F.3d at 234–235 (emphasis added). This court therefore adheres to the fact intensive analysis set forth in *Kuwaiti.*

Succinctly stated, the *Kuwaiti* analysis "determine[s] whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth." *Kuwaiti Danish Computer Co. v. Digital Equipment Corporation,* 781 N.E.2d at 799. The analysis thereby takes into account the purpose of chapter 93A to a greater degree than a test that systematically identifies and applies a particular set of factors to every case. *See Kuwaiti Danish Computer Co. v. Digital Equipment Corporation,* 781 N.E.2d at 799 ("the analysis required under § 11 should not be based on a test identified by any particular

---

**41.** Neither the answer to the second amended complaint nor the amended joint pretrial memorandum include this affirmative defense. (Docket Entry ## 123 & 143).

factor or factors because of a tendency to shift the focus of inquiry away from the purpose and scope of c. 93A"). As reflected in case law, the purpose or design of chapter 93A is to " 'encourage more equitable behavior in the marketplace and impose liability on persons seeking to profit from unfair practices.' " *Arthur D. Little, Inc. v. Dooyang Corporation,* 147 F.3d 47, 55 (1st Cir.1998) (quoting *Linkage Corp. v. Trustees of Boston Univ.,* 679 N.E.2d at 208).

■ Although the *Kuwaiti* analysis discounts the inflexibility of a test that always applies the same three factors, the analysis does not reject applying such factors and assessing the importance or impact of a particular factor if appropriate under the facts and circumstances of a case. Similarly, while the *Kuwaiti* analysis discards a formula that simply counts the number of instances of misconduct to determine the jurisdiction where the misconduct occurred, it leaves ample room for considering the number of instances of misconduct or for affording a single instance of misconduct "greater significance" if appropriate under the facts and circumstances of a case. *Kuwaiti Danish Computer Co. v. Digital Equipment Corporation,* 781 N.E.2d at 798–799 ("it may, or may not, be appropriate to decide cases involving wrongful conduct in multiple jurisdictions based on which jurisdiction was the source of the most instances of misconduct"). Under the *Kuwaiti* analysis, "the source" of the wrongful conduct, where the misconduct was received, and where it was "acted on" may therefore all play roles as factors if appropriate in a particular case. *Kuwaiti Danish Computer Co. v. Digital Equipment Corporation,* 781 N.E.2d at 798–799.

That said, the analysis examines the actionable conduct as opposed to the benign conduct on the part of the alleged wrongdoer. Contacts with Massachusetts that were neither unfair nor deceptive do not play a part in assessing whether the misconduct occurred primarily and substantially in Massachusetts. *See Kuwaiti Danish Computer Co. v. Digital Equipment Corporation,* 781 N.E.2d at 800 (because "[t]here was nothing unfair or deceptive about those policies," they "cannot be considered on the question whether the wrongful conduct occurred 'primarily and substantially' in Massachusetts"). Consequently, it is only after a court makes findings of fact and considers those findings in the context of the entire section 11 claim, that a court can determine whether the center of gravity lies primarily and substantially in Massachusetts. *See Kuwaiti Danish Computer Co. v. Digital Equipment Corporation,* 781 N.E.2d at 799. Accordingly, before applying the *Kuwaiti* analysis to the case at bar, this court examines and identifies what, if any, misconduct on the part of Stainsafe violated section 11.

Chapter 93A prescribes "unfair methods of competition and unfair and deceptive acts or practices." Mass. Gen. L. ch. 93A, §§ 2 & 11. The statute, which is "neither wholly tortious nor wholly contractual in nature," *Buster v. George W. Moore, Inc.,* 438 Mass. 635, 783 N.E.2d 399, 412 (2003), does not define either "unfair" or "deceptive." *Arthur D. Little, Inc. v. Dooyang Corporation.* 147 F.3d 47, 55 (1st Cir.1998). " '[W]hether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact.' " *Damon v. Sun Co., Inc.,* 87 F.3d 1467, 1484 (1st Cir.1996). As instructed by the SJC, determining chapter 93A liability requires the court to "focus on the nature of the challenged conduct and on the purpose and effect of that conduct as the crucial factors in making a G.L. c. 93A fairness determination." *Massachusetts Employers Insurance Exchange v. Propac–Mass, Inc.,* 420

Mass. 39, 648 N.E.2d 435, 438 (1995) (characterizing phrases such as " 'level of rascality' " and " 'rancid flavor of unfairness' " as "uninstructive").

■ A practice is "unfair" within the meaning of chapter 93A "if it is within the penumbra of some common-law, statutory, or other established concept of unfairness" or "is immoral, unethical, oppressive, or unscrupulous." *PMP Associates v. Globe Newspaper Co.*, 366 Mass. 593, 321 N.E.2d 915, 918 (1975); *accord Cambridge Plating Co., Inc. v. Napco, Inc.*, 85 F.3d 752, 769 (1st Cir.1996) (same; quoting *PMP*, 321 N.E.2d at 917). First, consistent with the jury's finding, this court finds that the breach of the implied duty of good faith amounting to $33,632 in damages also violated chapter 93A. Given the facts, for purposes of chapter 93A liability the breach of the implied duty of good faith resulted from the failure to provide Williamsville with reasonable notice of termination. *See Cherick Distributors, Inc. v. Polar Corporation*, 41 Mass.App.Ct. 125, 669 N.E.2d 218, 220–221 (1996).

Second, Stainsafe's purchases of wood, fabric and lacquer care products encompassed within the Williamsville product line from other vendors during the life of the exclusive dealing contract, minus the leather component, contravenes section 11.[42] For reasons stated in the March 29, 2004 Order (Docket Entry # 209, pp. 17–19) and the foregoing facts, the exclusive dealing contract, minus the leather component, ended in the spring of 2001. Prior thereto, however, Stainsafe purchased wood, fabric and lacquer care products covered by the contract from other vendors, including ICT, a Williamsville competitor. As already determined, the exclusive dealing contract required Stainsafe to purchase its requirements for such goods exclusively from Williamsville.

■ A buyer subject to an exclusive dealing contract or requirements contract has an obligation to act in good faith and therefore determine its requirements in good faith. *Fashion House, Inc. v. K mart Corporation*, 892 F.2d 1076, 1085 (1st Cir.1989) ("the contract was a requirements contract. As such, K Mart had an enduring duty to determine the extent of its requirements in good faith"); *Mishara Construction Co., Inc. v. Transit–Mixed Concrete Corporation*, 365 Mass. 122, 310 N.E.2d 363, 365 (1974) (when quantity is measured in terms of requirements, it means "the actual good faith" requirements of the buyer); Mass. Gen. L. ch. 106, § 2–306. Good faith reductions in a seller's requirements for legitimate business reasons are entirely permissible. *Atlantic Track & Turnout Company v. Perini Corporation*, 989 F.2d 541, 545–546 (1st Cir.1993) (adopting *Empire Gas* rationale and noting, "Atlantic offered no evidence that Perini did not agree to end the MBTA contract due to a valid independent business reason"); *Empire Gas Corporation v. American Bakeries Co.*, 840 F.2d 1333, 1339 (7th Cir.1988) (American Bakery was "not acting in bad faith if it had a business reason for deciding not to convert that was independent of the terms of the contract or any other aspect of its relationship with Empire Gas"); *Indiana–American Water Co. v. Town of Seelyville*, 698 N.E.2d 1255, 1261 (Ind.App.Ct.1998) ("if the buyer has a legitimate business reason for eliminating its requirements, as opposed to desire to avoid its contract, the buyer acts in good faith"). Where, as here, however, the buyer reduces its purchases because it is buying goods covered by the exclusive dealing or requirements contract from another vendor, it undoubtedly acts in bad faith.

---

**42.** Even if not expressly discussed, this court finds no other violation of chapter 93A.

*Atlantic Track & Turnout Company v. Perini Corporation*, 989 F.2d at 545–546 (1st Cir.1993) (adopting *Empire Gas* rationale); *Empire Gas Corporation v. American Bakeries Co.*, 840 F.2d 1333, 1339 (7th Cir.1988) ("Clearly, American Bakeries was acting in bad faith if during the contract period it bought propane conversion units from anyone other than Empire Gas, or made its own units").

A breach of the duty of good faith may lead to chapter 93A liability. *See Anthony's Pier Four v. HBC Associates*, 411 Mass. 451, 583 N.E.2d 806, 820–821 (1991); *accord Massachusetts Employers Insurance Exchange v. Propac–Mass, Inc.*, 420 Mass. 39, 648 N.E.2d 435, 438 (1995) ("breach of the implied covenant of good faith and fair dealing may constitute an unfair or deceptive act or practice"); *see also Cool Light Co., Inc. v. GTE Products Corporation*, 973 F.2d 31, 33 n. 3 (1st Cir.1992) (recognizing that a breach of the implied duty of good faith and fair dealing by the jury does not always compel the finding of a violation of chapter 93A). Stainsafe purchased wood, fabric and lacquer care products from other vendors, including ICT, a Williamsville competitor, during the life of the exclusive dealing contract. Such conduct, as expressed in *Empire Gas*, "[c]learly" amounts to bad faith conduct.

Moreover, Stainsafe concealed its purchases from Williamsville and deceptively explained its reason for asking Williamsville not to assemble kits without a work order as tying up cash flow and space.[43]

Concerned that Williamsville might discover its misconduct and withhold inventory, Stainsafe asked Johnson, then located in Massachusetts, to increase Williamsville's insurance coverage. Forecasts, sent to Williamsville in Massachusetts in 2000, were misleadingly inaccurate at a time when Stainsafe was, at a minimum, purchasing fabric care products from ICT.[44] In sum, given the deceptive aspect to Stainsafe's conduct as well as its violation of the covenant of good faith, Stainsafe's conduct in purchasing products encompassed within the Williamsville product line from other vendors during the life of the exclusive dealing contract, minus the leather component, violates section 11.[45]

■ Stainsafe failed to prove that the misconduct did not occur primarily and substantially in Massachusetts. Taking into account the purpose and scope of chapter 93A under the fact intensive approach of *Kuwaiti*, the focal point of the parties' relationship with respect to the actionable conduct was the manufacture of goods covered by the exclusive dealing contract. Even assuming that Stainsafe's purchases took place outside Massachusetts, Williamsville suffered the loss in Massachusetts. Johnson learned of and incurred the loss in Massachusetts. *See Garshman Co., Ltd. v. General Electric Co.*, 176 F.3d 1, 7 (1st Cir.1999) (finding that the defendant met its burden but nevertheless noting "it is not insignificant that Garshman learned of the loss and incurred the loss in Massachusetts"); *Auto Shine Car Wash Systems, Inc. v. Nice 'N*

---

**43.** Stainsafe communicated this request by letter sent to Massachusetts.

**44.** The forecasts of future growth do not provide an independent basis of chapter 93A liability. Rather, they constitute part of the deceptive and unfair activity concealing the purchases from third party vendors.

**45.** In the alternative, irrespective of the finding of a violation of the covenant of good faith and fair dealing, Stainsafe's deceptive, knowing and unethical conduct in purchasing the goods covered by the exclusive dealing contract from other vendors, including a Williamsville competitor, while the contract was still in effect violates section 11.

*Clean Car Wash, Inc.*, 58 Mass.App.Ct. 685, 792 N.E.2d 682, 686 (2003) ("result for both plaintiffs was a loss of business within the Commonwealth"). The manufacturing of products in the Williamsville product line under the exclusive dealing contract took place entirely in Massachusetts. Under the facts, a number of the deceptive and misleading communications were made to Massachusetts. Williamsville received and acted upon the misconduct in Massachusetts. *See Auto Shine Car Wash Systems, Inc. v. Nice 'N Clean Car Wash, Inc.*, 58 Mass.App.Ct. 685, 792 N.E.2d 682, 688–89. It does not serve the purpose of chapter 93A, which is designed to encourage more equitable behavior in the marketplace, to allow a defendant to avoid liability by purchasing products in breach of the duty of good faith from third party vendors who, conveniently, are not located in Massachusetts. *See Kuwaiti Danish Computer Co. v. Digital Equipment Corporation*, 781 N.E.2d at 799 (analysis should not be based on test that shifts focus "away from the purpose and scope of c. 93A"). Under the fact intensive approach mandated by *Kuwaiti*, Stainsafe fails in its burden with respect to the chapter 93A claim involving Stainsafe's purchases of wood, fabric and lacquer care products encompassed within the Williamsville product line from other vendors dur-

ing the life of the exclusive dealing contract, minus the leather component.[46]

This court reaches a similar conclusion with respect to the chapter 93A claim stemming from Stainsafe's failure to provide Williamsville with reasonable notice of termination. Applying the *Kuwaiti* anaylsis, Stainsafe fails in its burden of showing that the center of gravity that gives rise to this chapter 93A claim did not occur primarily and substantially in Massachusetts.

 Finally, notwithstanding Stainsafe's argument to the contrary, Williamsville established that it suffered a "loss of money or property" within the meaning of section 11. The necessary "loss of money must stem from" the chapter 93A misconduct. *Arthur D. Little, Inc. v. Dooyang Corporation*, 147 F.3d at 56 (further noting that "[w]hether the causal connection has been proven is one of fact"); *see also RSA Media, Inc. v. AK Media Group, Inc.*, 260 F.3d 10, 16 (1st Cir.2001) ("causation remains a necessary element of a successful 93A claim"). "In the absence of a causal connection between the alleged unfair acts and the claimed loss, there can be no [chapter 93A] recovery."[47] *Massachusetts Farm Bureau Federation v. Blue Cross*, 403 Mass. 722, 532 N.E.2d 660, 665 (1989).

Howard J. Gordon ("Gordon") testified that Williamsville's lost profits resulting

**46.** The decision in *Stoneridge Control Devices, Inc. v. Teleflex, Inc.*, 2004 WL 389105 (Mass.Super. Feb.17, 2004), is distinguishable on its facts. Although Pollak Actuator Division ("Pollak") operated its offices and manufacturing facility in Boston, unlike Williamsville, it also had offices in Michigan, the location of the Teleflex facility involved in the misconduct. Moreover, Pollak's Michigan facility "played a significant role." *Stoneridge Control Devices, Inc. v. Teleflex, Inc.*, 2004 WL 389105 at *1 (Mass.Super. Feb.17, 2004). In addition and unlike the circumstances in the case at bar, testing of the product was performed at the Ford and the

Teleflex facilities in Michigan as well as in Boston and Teleflex signed the letter of intent in Michigan.

**47.** In contrast, Williamsville did not suffer a claimed loss from the deceptive conduct of Stainsafe in the spring and summer of 1998. There is an absence of causal connection to the claimed loss from Stainsafe's secret negotiations with Uniters during this time period as well as from Stainsafe's acquisition of information from Williamsville through false pretenses.

from the sales to third party vendors for wood care products amounted to $15,866 in 2000 and for other products, i.e., the category that includes fabric and lacquer care products, amounted to $8,811 in 1999 and $79,804 in 2000. Prior to the termination of the exclusive dealing contract in the spring of 2001, Williamsville suffered lost profits in the amount of $69,623 because of Stainsafe's purchases of wood care products from other vendors and $45,907 because of Stainsafe's purchases of fabric and lacquer care products from other vendors. These damages total $220,011. Together with the $33,632 damages for the violation of the covenant of good faith and fair dealing, Williamsville's total chapter 93A damages amount to $253,643.[48]

## B. Multiple Damages

▮ Section 11 contains a punitive damages provision if the defendant's unfair method of competition or unfair or deceptive act was "a wilful or knowing violation." Mass. Gen. L. ch. 93A, § 11. The provision contemplates liability measured by degrees. *Damon v. Sun Co., Inc.,* 87 F.3d 1467, 1485 (1st Cir.1996) (" 'shades of culpability are supposed to matter in applying the punitive damages provision' "). A higher degree of culpability than that required for liability under section 11 is required to impose punitive damages. *Cambridge Plating Co., Inc. v. Napco, Inc.,* 85 F.3d 752, 770 (1st Cir.1996); *accord International Fidelity Insurance Co. v. Wilson,* 387 Mass. 841, 443 N.E.2d 1308, 1317 (1983) ("multiple damage provisions of c. 93A are designed to impose a penalty . . . that varies with the culpability of the defendant"). Callous and intentional violations of section 11 thereby warrant multiple damages. *Heller v. Silverbranch Construction Corporation,* 376 Mass. 621, 382 N.E.2d 1065, 1070 (1978) (interpreting sim-

ilar language in section 9); *Cambridge Plating Co., Inc. v. Napco, Inc.,* 85 F.3d at 770 (citing this language from *Heller* in section 11 case). Given the facts, this court finds that Stainsafe's misconduct met this higher degree of culpability.

## C. Settlement Offer

Notwithstanding the finding of a willful or knowing violation, a defendant can limit its liability to single damages by tendering a reasonable settlement offer with its answer. Mass. Gen. L. ch. 93A, § 11. Section 11 provides that, if the offer is "reasonable in relation to the injury actually suffered" by the plaintiff, then the court cannot award more than single damages. Mass. Gen. L. ch. 93A, § 11. The section thereby "parallels section 9 by allowing the defendant in a Chapter 93A action to escape liability for multiple damages by tendering a reasonable settlement offer." *Evans v. Yegen Associates, Inc.,* 556 F.Supp. 1219, 1235 n. 6 (D.Mass.1982).

Both sections have the same "prime goal" of promoting reasonable settlement offers, albeit through the use of different procedures. *International Fidelity Insurance Co. v. Wilson,* 387 Mass. 841, 443 N.E.2d 1308, 1318 (1983) ("promotion of reasonable settlement offers is a prime goal of c. 93A, §§ 9 & 11"); *Nader v. Citron,* 372 Mass. 96, 360 N.E.2d 870, 874 (1977) ("[s]ection 11 provides a different procedure for achieving the same objectives of facilitating settlement"). They also contain the same language allowing a defendant to limit recovery by tendering a settlement offer that "was reasonable in relation to the injury actually suffered by the petitioner." Mass. Gen. L. ch. 93A, §§ 9(3) & 11. Cases interpreting this language in section nine therefore provide a useful analogy. *See United States v. Nip-*

---

**48.** The $33,632 sum is duplicative of the jury award.

*pon Paper Industries Co., Ltd.,* 109 F.3d 1, 4 (1st Cir.1997) (recognizing the "fundamental interpretive principle that identical words or terms used in different parts of the same act are intended to have the same meaning"); *cf. Nader v. Citron,* 372 Mass. 96, 360 N.E.2d 870, 874 (1977) (declining to imply section nine demand letter into section 11 given the absence of support in the language and structure of section 11 while noting that section nine's provisions elsewhere provided "'a useful analogy'").

■ In response to "meritorious claims" or, stated otherwise, "clearly valid claims" brought under section 11, a defendant can avoid multiple damages by tendering a reasonable settlement offer at the outset of the litigation. *See International Fidelity Insurance Co. v. Wilson,* 443 N.E.2d at 1318. Stainsafe, as the party asserting the protection of the statutory limitation to single damages, "has the burden of proving the reasonableness of the settlement tendered." *Kohl v. Silver Lake Motors, Inc.,* 369 Mass. 795, 343 N.E.2d 375, 378 (1976) (interpreting section nine).

■ Losses which were not foreseeable consequences of the defendant's unfair or deceptive act should not be included in the calculation. *See Kohl v. Silver Lake Motors, Inc.,* 343 N.E.2d at 379 (interpreting prior language in section nine that was identical to language in section 11 regarding the necessary causal relationship and concluding that the "injury actually suffered" did not include damages suffered from the breach of the contract as opposed to from the unfair or deceptive act). Stainsafe's conduct regarding the failure to pay for goods sold and delivered was not extortionate and otherwise did not rise to the level of a chapter 93A violation. Rather, it was a mere breach of contract, even if a knowing breach. Such losses were not foreseeable consequences of the chapter 93A misconduct. The value of the settlement therefore does not include damages resulting from this loss, which the jury calculated as amounting to $72,000, and the parties' letters calculated as $142,054.08. Likewise, lost profits due to the Leather Master transaction or promises related thereto were also not foreseeable consequences of the chapter 93A misconduct. In the immediate aftermath of the Leather Master transaction Williamsville's gross profits significantly increased. Finally, as more than reasonably argued by Stainsafe, the mislabeling did not contain the Williamsville name or "distinct Williamsville markings."[49] (Docket Entry # 242). Losses resulting therefrom were not foreseeable consequences of Stainsafe's deception.

Given this court's chapter 93A determinations and the damages causally connected thereto, "the injury actually suffered" amounts to $253,643. Attorneys' fees also do not form a part of the equation. *See Kohl v. Silver Lake Motors, Inc.,* 343 N.E.2d at 379 (interpreting section nine and concluding that attorneys' fees are not part of the "'injury actually suffered by the petitioner'").

■ The reasonableness of the tender is a question of fact determined in light of the attendant circumstances. *Whelihan v. Markowski,* 37 Mass.App.Ct. 209, 638 N.E.2d 927, 930 (1994) (interpreting section nine and noting, "Whether an offer is reasonable is normally a question of fact ... which must be determined in light of

---

**49.** As discussed by this court on summary judgment (Docket Entry # 83), the mislabeling allegations were insufficient with respect to monetary damages. For present purposes only, there is also an absence of a loss of money or property within the meaning of section 11.

... all the attendant facts and circumstances"). In the case at bar, such circumstances include the original and amended complaint as well as the terms of Williamsville's offer.

By letter dated May 11, 2001, Williamsville's counsel transmitted a copy of the original complaint to Stainsafe's counsel and urged that the parties attempt to settle their dispute. (Ex. 238). The allegations in the original complaint, as well as in the amended complaint filed a few days after the original complaint,[50] contained a general allegation that Stainsafe committed unfair and deceptive acts and practices and then incorporated the previous paragraphs of the pleading. The complaint also included claims for breach of contract, breach of goods sold and delivered, breach of the implied duty of good faith, promissory estoppel and violations of trademark law and the Lanham Act.

On May 24, 2001, Stainsafe made a settlement offer after having seen the original complaint. It agreed to pay all of the outstanding invoices. It also explained that it had contacted the two retailers identified by Williamsville with respect to the mislabeling and attempted to remove the mislabeled product from store shelves. Stainsafe further proposed that: (1) Williamsville would ship product when ordered; (2) Stainsafe would pay for the product within 60 days; (3) Williamsville would agree that Stainsafe did not have an obligation to purchase products exclusively from Williamsville; and (4) Williamsville would agree to a non-compete limited to customers who had received product from Stainsafe within the last two years. Given the legitimately perceived weakness in the breach of contract and promissory estoppel claims, Stainsafe proposed the above terms as a global settlement.

Williamsville rejected the offer and by letter dated July 3, 2001, proposed the following settlement:[51] (1) Stainsafe would acknowledge that Williamsville is not subject to a non-compete agreement; (2) Stainsafe would pay Williamsville $142,054.08 in outstanding invoices; (3) Stainsafe would change the language on its labels, packaging materials, web site and other promotional materials so that it did not resemble Williamsville's packaging and promotional materials; (4) Stainsafe would indemnify Williamsville and hold Williamsville harmless from any third party claims resulting from mislabeled products; (5) Stainsafe would retrieve all remaining non-ArtVan inventory from Williamsville's facility; (6) Stainsafe would agree to continue the parties' relationship for five ArtVan products for a three year period at prices significantly higher than existing prices; (7) Stainsafe would pay Williamsville's legal fees; and (8) violation of the settlement agreement would entitle the non-breaching party to injunctive relief and attorneys' fees.

In a prompt response to the July 3, 2001 settlement proposal, Stainsafe agreed to the substance of the majority of the demands except for the payment of legal fees and the increase in prices beyond existing levels. Williamsville rejected the revised offer. By rejecting Stainsafe's offer to do business for three years with respect to the five products identified in the July 3, 2001 letter, Williamsville lost the opportu-

---

**50.** Although the amended complaint included a misrepresentation count, the count was similar to the promissory estoppel count in the original complaint. For present purposes, the amended complaint and original complaint parallel each other.

**51.** By July 3, 2001, Williamsville had filed the amended complaint and Stainsafe had responded with a motion to dismiss. After the district judge denied the motion to dismiss in late September 2001, Stainsafe filed an answer in early October 2001.

nity to make significant profits. *See, e.g., Kohl v. Silver Lake Motors, Inc.*, 343 N.E.2d at 380 (valuing settlement offer included balancing the advantage of getting the full refund for the "vehicle, which was then second hand"). Johnson's testimony at trial regarding profits relative to ArtVan products is less convincing than Gordon's testimony. According to Gordon, Williamsville suffered $211,000 in lost profits for wood care products in 2001 and $92,000 for the first four months of 2002, an amount corresponding to an annual loss of $276,000. Discounting these figures to account for products outside the scope of the settlement offer nonetheless yields a sizable figure of lost profits during the proposed three year time period for the five ArtVan products.[52] Comparing that figure to the $253,643 injuries actually suffered, the settlement offer was "reasonable in relation to the injury actually suffered." Mass. Gen. L. ch. 93A, § 11, ¶ 5.

## CONCLUSION

In accordance with the foregoing discussion, Williamsville's chapter 93A recovery is limited to single damages of $253,643. Of this amount, $33,632 is duplicative of the jury's award. This court will hear argument as to the duplicative nature of the remaining portion of the chapter 93A award, which amounts to $220,011, in conjunction with determining attorneys' fees. As expressly allowed under section 11, Williamsville is entitled to recover "reason-

able attorneys' fees and costs." as to the duplicative nature of this award. Williamsville may recover its reasonable attorneys' fees and costs. This court will conduct a status conference at 11:00 a.m. on October 28, 2004, to discuss the scheduling of the remaining non-jury claims and the determination of the amount of attorneys' fees and costs under chapter 93A.

### Addendum A

The letter agreement is a short, one page agreement containing five paragraphs. The agreement does not include an integration clause. The first paragraph describes the purpose of the agreement. The stated purpose is to "establish a business relationship between Stainsafe and Williamsville so that Stainsafe can comfortably offer and sell a complete *wood* care program to their customers ... while profitably promoting the sales of the Williamsville *product line* under the Stainsafe name ...." (Ex. 504; emphasis added).

As explained in the second, third and fourth paragraphs, this dual purpose is to allow Stainsafe to compete in the wood care residential furniture market while promoting RGJ's product line. The second and third paragraphs detail and refine the obligation undertaken by RGJ not to directly compete with Stainsafe in "the residential furniture retail store market."[53] The only express example in these two paragraphs relative to RGJ's obli-

---

**52.** Williamsville did not have a large number of wood care products. Johnson described Williamsville's wood care products as comprising a "couple of different" wood care polishes, a wax polish, an oil polish, touch up products and a wood care kit. This court therefore draws the reasonable inference that the ArtVan products proposed by Williamsville as part of the settlement correspond to the bulk of the wood care products that Gordon included in his forecast of lost profits resulting from lost sales of wood care prod-

ucts to Stainsafe. In any event, this court discounts the value to account for the inclusion of additional products in Gordon's calculations.

**53.** The third paragraph also includes an obligation undertaken by Stainsafe "not to directly market Teak Oil as a single product to the Scandinavian store market unless it is part of a complete package." (Ex. 504).

gation not to compete is the *"Wood* Maintenance Kit developed by ArtVan." (Ex. 504; emphasis added). The fourth paragraph describes the primary obligation undertaken by Stainsafe, to wit, "to put forth a conscious sales effort in order to annually increase their sales of the Williamsville *product line."* (Ex. 504; emphasis added).

Thus, the structure of the letter agreement outlines the agreement's dual purpose in the first paragraph, states RGJ's obligation in the second paragraph while further refining that obligation in the third paragraph, and then states Stainsafe's obligation in the fourth paragraph. The fifth and final paragraph clarifies that the agreement only covers "the residential retail market" and does not cover "residential furniture manufacturers, the contract furniture market, the institutional furniture market or other markets that deal with *wood* products." (Ex. 504; emphasis added).

Finally, the agreement provided that if Stainsafe's "annual volume" became flat or declined, the "Non–Compete Agreement can be canceled upon ninety (90) day written notice." Although the agreement does not include an end date, Stainsafe's obligation is described as putting forth a conscious sales effort to *"annually* increase" Williamsville's product line. (Exhibit 504; emphasis added).

The letter agreement does not define Williamsville's "product line." In particular, the letter agreement does not clarify whether Williamsville's product line only includes the after market wood care residential furniture market or whether it also includes Willaimsville's other products sold to Stainsafe, to wit, leather, fabric and lacquer care. Although the agreement refers to ArtVan's "Wood Maintenance Kit," it does so in the context of describing Williamsville's obligation, not Stainsafe's obligation to use a conscious sales effort to annually increase Williamsville's product line.

As to the language referring to wood in the first paragraph, placed in context of the entire agreement, it allows Stainsafe to comfortably sell a wood care program because Williamsville's exclusivity obligation prevents Williamsville from competing in the wood care residential furniture market. This reasonable construction does not limit or restrict the Williamsville product line to wood care products. In essence, Stainsafe made a promise to put forth a conscious sales effort to annually increase sales of the Williamsville product line. In return, Williamsville made a promise not to compete in the residential furniture retail store market and, in particular, the wood care segment of that market. Accordingly, irrespective of the obligation undertaken by Stainsafe, it is Williamsville's promise that allowed Stainsafe to "comfortably offer and sell a complete wood care program to their customers." (Ex. 504).

Examining the language in the fifth paragraph, the first sentence restricts the agreement as covering "only the residential retail market." It does not read, "only the residential retail market dealing with wood products." The first sentence therefore limits the agreement to covering the "residential retail market" as opposed to further restricting the agreement to cover only segments within the residential retail market. Furthermore, the parties knew how to restrict "the residential retail market" to that dealing with wood care products inasmuch as they employ such words in the very next sentence when discussing markets not covered by the agreement with the language, "other markets that deal with *wood* products." The parties nevertheless chose not to place the phrase "wood products" immediately preceding or immediately following the phrase "residential retail market." (Ex. 504).

In sum, the language referring to wood in the first, second, third and fifth paragraphs of the agreement does not limit or modify Stainsafe's obligation described in the fourth paragraph to put forth a conscious sales effort to promote the Williamsville product line. The agreement does not define the Williamsville product line.

... The UCC's parol evidence rule, which applies to the present dispute, appears in section 2–202 and reads as follows:

**§ 2–202. Final Written Expression: Parol or Extrinsic Evidence**

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in *a writing intended by the parties as a final expression of their agreement* with respect to such terms as are included therein *may not be contradicted* by evidence of any prior agreement or of a contemporaneous oral agreement *but may be explained or supplemented*

(a) *by course of dealing or usage of trade, (section 1–205) or by course of performance* (section 2–208); and

(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

Mass. Gen. L. ch. 106, § 2–202 (emphasis added).[54]

As indicated in section 2–202(a), "A sale contract need not be ambiguous for the admission of evidence of course of dealing, course of performance, or usage of trade." *Campbell Farms v. Wald,* 578 N.W.2d 96, 100 (N.D.1998) (interpreting identical UCC provision adopted in North Dakota); *C–Thru Container Corporation, v. Midland Manufacturing Co.,* 533 N.W.2d 542, 544 (Iowa 1995) (discussing identical UCC section adopted in Iowa and holding "that even a 'complete' contract may be explained or supplemented by parol evidence of trade usages"). Comment one of the UCC's official comment to section 2–202 explains that section 2–202 "definitely rejects ... [t]he requirement that a condition precedent to the admissibility of the type of evidence specified in paragraph (a) is an original determination by the court that the language used is ambiguous." Mass. Gen. L. ch. 106, § 2–202, UCC Comment, cmt. 1.[55]

**54.** The provision of section 2–202(a) allowing the introduction of evidence of the parties' course of dealing to explain or supplement an integrated agreement is similar to Massachusetts common law. Under Massachusetts common law, "When the written agreement, as applied to the subject matter, is in any respect uncertain or equivocal in meaning, all the circumstances of the parties leading to its execution may be shown for the purpose of *elucidating,* but not of *contradicting* or changing its terms." *Robert Industries, Inc. v. Spence,* 362 Mass. 751, 291 N.E.2d 407, 409 (1973) (emphasis added). Likewise, custom and usages "known to contracting parties, respecting the subject matter of an agreement, are by implication incorporated therein, unless expressly or impliedly excluded by its terms, and are admissible to aid in its

interpretation, not as tending in any respect to contradict or vary a contract, but upon the theory that the usage forms a part of the contract." *Affiliated FM Insurance Company v. Constitution Reinsurance Corporation,* 416 Mass. 839, 626 N.E.2d 878, 882 (1994) (internal quotation marks omitted).

**55.** The Massachusetts comment to section 2–202 clarifies that the UCC's parol evidence rule embodies the common law approach "subject to the limitations" of comment one of the UCC's official comment. Mass. Gen. L. ch. 106, § 2–202, Massachusetts Code Comment; *Westinghouse Elevators of Puerto Rico, Inc. v. S.I.U. de Puerto Rico,* 583 F.2d 1184, 1187 (1st Cir.1978) (paraphrasing Massachusetts Code Comment to section 2–202 and

The initial task for the court is therefore to determine whether the parties intended the letter agreement to be a final expression of their agreement.[56] *See Luria Brothers & Co., Inc. v. Pielet Brothers Scrap Iron & Metal, Inc.,* 600 F.2d 103, 109 (7th Cir.1979) (interpreting identical section 2–202 of UCC and noting that "[t]he determination that the writings of the parties were intended to be a final expression" is "made by the trial court"); *accord Alaska Northern Development, Inc. v. Alyeska Pipeline Service Company,* 666 P.2d 33, 37 (Alaska 1983) (discussing identical section 2–202 of UCC and noting that court must first determine if parties intended writing to embody final expression); *accord Brennan v. Carvel Corporation,* 929 F.2d 801, 807 (1st Cir.1991) ("under Massachusetts law, the determination of whether a contract is completely or partially integrated ... is a question of fact to be decided in the first instance by the trial judge"). In Massachusetts, "[t]he concept of 'integration' " in Massachusetts' common law parol evidence rule is consistent with the inquiry into whether the parties intended their writing to be " 'a final expression of their agreement.' " Mass. Gen. L. ch. 106, § 2–202, Massachusetts Code Comment. Cases involving the determination of integration at common law are therefore germane to the determination of whether the parties' intended the letter agreement to be a final expression of their agreement under the UCC.

An agreement is integrated where the agreement, "in view of its completeness and specificity[,] reasonably appears to be a complete agreement ... unless it is established by other evidence that the writing did not constitute a final expression." *Coll v. PB Diagnostic Systems, Inc.,* 50 F.3d 1115, 1123 (1st Cir.1995);[57] *see also Restatement (Second) of Contracts* §§ 209(3) & 214 (1981). Whether a writing is integrated is a question of the parties' intent and evidence may " 'be received beyond the writing proper.' " *Antonellis v. Northgate Construction Corp.,* 362 Mass. 847, 291 N.E.2d 626, 627 (1973);

**56.** Case law and the *Restatement (Second) of Contracts* (1981) distinguish between partially and completely integrated documents in applying the parol evidence rule. An agreement may be partially integrated in the sense that it expresses the parties' final agreement or fully integrated in the sense that it expresses the parties' exclusive and complete agreement. *See Restatement (Second) of Contracts* § 213(1) & § 213(2) (1981); *Coll v. PB Diagnostic Systems, Inc.,* 50 F.3d 1115, 1122 (1st Cir.1995) (noting that parol evidence rule only applies where parties created *"partially or completely* integrated document" and citing section 213 of *Restatement (Second) of Contracts* (1981); emphasis added); 35 *Massachusetts Practice* § 1.26 (2001) (partially integrated contract may be supplemented with consistent additional terms but may not be contradicted whereas completely integrated agreement cannot be supplemented or contradicted by prior or contemporaneous agreements).

Section 2–202 of the UCC draws this distinction by providing that final expressions of the parties' agreement, i.e., partially integrated contracts, may not be contradicted but may be explained or supplemented by the parties' course of dealing, course of performance or usage of trade. Mass. Gen. L. ch. 106, § 2–202(a). Where the writing is a complete and exclusive statement of the parties' agreement, i.e., a completely integrated contract, section 2–202 prohibits even the introduction of consistent additional terms. Mass. Gen. L. ch. 106, § 2–202(b).

**57.** The First Circuit in *Coll* concluded that the employment agreement at issue was an integrated and final expression with respect to compensation matters because it listed Coll's base salary, annual bonus, severance compensation and non-compete agreement. *See Coll v. PB Diagnostic Systems, Inc.,* 50 F.3d at 1123.

accord *Restatement (Second) of Contracts* § 214 (1981) (court may consider parties' prior and contemporaneous negotiations in determining whether agreement is integrated); *see also Betaco, Inc. v. Cessna Aircraft Company,* 32 F.3d 1126, 1132 (7th Cir.1994) (discussing section 2–202 of UCC; whether agreement is integrated focuses " 'on the intent of the parties' "); *see generally Alaska Northern Development, Inc. v. Alyeska Pipeline Service Company,* 666 P.2d at 37 (discussing section 2–202 of UCC and noting, "integrated writing exists where the parties intend" writing to be final expression of one or more terms). Factors to consider include "the length of the writing, whether the writing contains an integration clause and the conduct of the parties' prior negotiations." [58] *Town & Country Fine Jewelry Group, Inc. v. Hirsch,* 875 F.Supp. 872, 876 (D.Mass.1994) (citations omitted); *accord Betaco, Inc. v. Cessna Aircraft Company,* 32 F.3d at 1132–1133 (interpreting identical section 2–202 adopted in Kansas and examining factors such as the writing itself, presence of integration clause, nature and scope of prior negotiations).

■ The language of the letter agreement is relatively complete insofar as it sets forth the parties, the purpose of the agreement, the dual obligations undertaken by the parties and the scope of agreement. Although the parties did not engage in extensive negotiations before signing the letter agreement and Stainsafe requested a writing to update its records, the parties nevertheless intended the letter agreement to reflect their relationship. The language encompasses the subject matter of Stainsafe's obligation, to wit, "the Williamsville product line," although it does not define "the Williamsville product line." The agreement also does not place a time limit on Stainsafe's obligation to put forth a conscious effort to annually increase sales of the Williamsville product line or contain an integration clause.

On balance, this court concludes that the letter agreement is a partially integrated agreement, in other words, an agreement that is the parties' final expression but does not expressly encompass all of the agreement's terms or the complete and exclusive statement of the term "product line." Stated otherwise, the parties intended the letter agreement to be a final, albeit not exclusive, expression of their agreement and, in particular, Stainsafe's obligation to put forth a conscious effort to annually increase the sales of the Williamsville product line. Section 202–2 allows the admission of evidence of the parties' course of dealing and performance, as well as usage of trade, to explain and supplement the term "product line" but prohibits the introduction of prior or contemporaneous agreements to contradict the term "product line." Mass. Gen. L. ch. 106, § 2–202(a). In other words, course of dealing and course of performance evidence may explain the meaning of the term "product line," irrespective of an ambiguity, provided that such evidence is not inconsistent with the express term. *See Ralar Distributors, Inc. v. Rubbermaid, Inc.,* 4 F.3d 62, 68–69 (1st Cir.1993) (paraphrasing section 1–205(4) of UCC); *see*

---

**58.** Although this court may also consider the sophistication of the parties, the fact that Johnson did not consult an attorney before signing the letter agreement is not particularly significant. The letter agreement was short and not complex. *See, e.g., Betaco, Inc. v. Cessna Aircraft Company,* 32 F.3d at 1136 (not finding it "particularly significant that Mikelsons did not consult a lawyer" inasmuch as agreement was not lengthy or obtuse and parties were experienced).

*also Regina Grape Products, Company v. Supreme Wine Company,* 357 Mass. 631, 260 N.E.2d 219, 221 (1970) (noting that, "parol evidence is admissible ... not to contradict but to establish the terms of the contract" in partially integrated contract involving sale of goods, albeit not citing to section 2–202(a) of the UCC in discussing parol evidence rule).